UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| ENSIGN YACHTS, INC, | : | |
| --- | --- | --- |
| Plaintiff, | : | |
| | : | |
| v. | : | CIVIL ACTION NO. |
| | : | 3:09-cv-209 (VLB) |
| JON ARRIGONI ET AL., | : | |
| Defendants. | : | August 3, 2011 |

### MEMORANDUM OF DECISION DENYING PLAINTIFF AND THIRD PARTY DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AGAINST DEFENDANTS JON ARRIGONI AND LLOYDS OF LONDON [Doc. #224] AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AGAINST DEFENDANT JON ARRIGONI [Doc. #228]

Before the Court are motions for summary judgment filed by the plaintiff / counter claim defendant Ensign Yachts, Inc. ("Ensign") and third-party defendant James Ross ("Ross"), president of Ensign. In the first motion, Ensign and Ross seek summary judgment with respect to the fraud claims asserted against them by counter claimant / third party plaintiff Lloyds of London ("Lloyds") and defendant / counter claimant / cross claimant Jon Arrigoni ("Arrigoni"). [Doc. #224]. In the second motion, Ensign seeks summary judgment on its claim against Arrigoni pursuant to the Carmack Amendment to the Interstate Commerce Act, 49 U.S.C. § 14706. For the reasons stated hereafter, both motions are DENIED.

*I. FACTUAL BACKGROUND*

The following facts relevant to the instant motions are undisputed unless otherwise noted. This matter involves the overland transport of a 2008 Model Year 55' Cigarette Super Yacht (the "Yacht"). The Yacht was designed and manufactured as part of a joint venture between Ensign and Skip Braver

("Braver") of Cigarette Racing, LLC ("Cigarette").[1] Ensign's Local Rule 56(a)(1) Statement of Undisputed Facts [Doc. #229] (hereinafter "Pl. Rule 56(a)(1) Statement") ¶ 3. The Yacht was constructed in Turkey and thereafter was imported into the United States in mid-2007 via the port of Miami, Florida, and federally documented with the United States Coast Guard on June 14, 2007. *Id.* ¶ 5. Ensign claims that the cost of constructing the Yacht and transporting and importing it into the United States was $1 million. *Id.* ¶ 4. After the Yacht was imported, it was navigated by water from Miami to Stamford, Connecticut so that it could be marketed and sold. *Id.* ¶ 6.

Ensign claims that, in late 2007, it entered into a brokerage agreement with XTreme Games Watersports ("XTreme"), a company in the French West Indies, to attempt to sell the Yacht on Ensign's behalf. *Id.* ¶ 8. Ensign further claims that XTreme identified Masterski Pilou Agency ("Masterski") as a buyer, and that a contract to purchase the Yacht for the price of $1.2 million was entered into by the parties. *Id.* ¶ 9. Ensign submits as evidence a purchase agreement dated December 15, 2007 bearing the purported signature of Philippe Brun ("Brun"), principal of Masterski. Yacht Purchase Agreement [Doc. #65], Exh. 2. According to Ensign, Brun emailed XTreme's principal Fabrice Fontanez ("Fontanez") on November 27, 2007 indicating that Masterski and its investors were interested in

---

[1] Braver and Cigarette quit the joint venture in November 2007 because of a dispute with Ross regarding the distributor used to produce the Yacht. Ross Depo. [Doc. #253-1] at 158-59. Braver had wanted the Yacht constructed with a distributor in Italy, rather than the company used in Istanbul, Turkey. *Id.* As a result of Braver's withdrawal from the venture, no additional Yachts of the same model were produced. *Id.*

2

purchasing the Yacht.  Ensign and Ross' Local Rule 56(a)(1) Statement of Undisputed Facts [Doc. #225] (hereinafter "Pl./Third Party Def. 56(a)(1) Statement) ¶ 11.  Ensign claims that negotiations concerning price took place immediately thereafter.  *Id.* ¶ 12.  In anticipation of a sale, Ross created a template of the purchase agreement on December 7, 2007.  *Id.* ¶ 13.  Ensign claims that, on December 12, 2007, Brun sent an email to Fontanez stating, "Try to contact your friends as soon as possible because they [Masterski's investors] are in agreement to the purchase of the 55' Cigarette."  *Id.* ¶ 14.  This email as well as others between Brun and Fontanez were originally written in French; Ensign submits uncertified English-language translations prepared by a translator familiar with French "street slang" and verified by Fontanez.  *Id.* ¶¶ 11, 14, 16.  After receiving notification from Fontanez that Masterski had agreed to purchase the Yacht on December 12, 2007, Ross sent Masterski a copy of the purchase agreement for signature, along with specifications for the Yacht, an invoice, and bank wiring instructions.  *Id.* ¶ 15.  On December 15, 2007, because Ensign had not received back an executed purchase agreement from Masterski, Ross sent a copy of the purchase agreement to Fontanez so that he could arrange for its execution by Masterski.  *Id.* ¶ 17.  Fontanez testified that he in turn transmitted the purchase agreement to Masterski for execution, that he received an executed copy bearing Brun's signature back within one week, and that he then sent the executed agreement to Ross.  *Id.* ¶¶ 18-20.

Lloyds and Arrigoni dispute that Ensign had a contract to sell the Yacht to Masterski, and claim that the purchase agreement submitted by Ensign which

3

contains Brun's signature is a forgery. In support of this contention, they cite the deposition testimony of Brun, principal of Masterski. Brun testified that he never signed, received, or even saw a contract to purchase the Yacht from Ensign, and that he never told either Ross or Fontanez that he was going to purchase the Yacht. Brun Depo. [Doc. #253-3] at 41-42. Brun further testified that although he was interested in purchasing the Yacht and wanted to begin negotiations with Ensign, he first needed to obtain a Certificate of European Compliance for the Yacht, which is required in order to register a vessel in the French West Indies. *Id.* at 35, 43. Brun testified that he emailed Ross directly on December 12, 2007 and requested him to provide a Certificate of European Compliance. *Id.* at 43. He also spoke to Ross the following day and explained that he needed written proof that the Yacht conformed with European, not just American, safety and other security requirements. *Id.* at 49. However, Brun never received the Certificate of European Compliance, and had no further communications with Ross. *Id.* at 50.

In addition, Lloyds and Arrigoni contest Fontanez's translation of the December 12, 2007 email. According to a certified translation obtained by Lloyds, the email actually says that Brun and his investors are "eager to buy" or "hot to buy" the vessel, not that they are "in agreement" to do so. Lloyds' Exh. J [Doc. #263-10]; Arrigoni Exh. A [Doc. #240]. Lloyds and Arrigoni also note that a "computer log" that Ensign has submitted which displays the dates that documents from Ross's computer were "created" and "last modified" shows that Ross did not create the purchase agreement until December 15, 2007, contradicting Ross's contention that he drafted the agreement on December 7,

2007 and emailed it to Masterski on December 12, 2007. *See* Computer Log [Doc. #201], Exh. A. In addition, Lloyds and Arrigoni point out that in the December 12, 2007 email itself, Ross states that he is attaching three documents - a commercial invoice, specifications for the Yacht, and wire transfer information - but makes no mention whatsoever of the purchase agreement. *See* [Doc. #201], Exh. B. Finally, Ross himself testified during his deposition that he created the purchase agreement on December 15, 2007 and that prior to that date he had not sent an agreement for execution by Masterski. Ross Depo. [Doc. #263-4] at 101-02.

In early December 2007, Ross first contacted Arrigoni regarding possible transport of the Yacht from Stamford to Miami. Pl. Rule 56(a)(1) Statement ¶ 10. Arrigoni is a federally registered motor carrier specializing in the overland transport of marine vessels. *Id.* ¶ 2. Ensign claims that the reason Ross contacted Arrigoni at this time was to meet Ensign's obligation under the purchase agreement to deliver the Yacht to Masterski in the French West Indies by mid-January 2008. *Id.* ¶ 10. Ensign further claims that Ross advised Arrigoni that he had a contract to sell the Yacht that required immediate delivery to Florida. *Id.* ¶ 11. Arrigoni testified, however, that Ross never told him whether or not the Yacht had been sold and did not indicate the reason he was moving the Yacht to Florida. Arrigoni Depo. [Doc. #253-4] at 25. Thereafter, Arrigoni and Ensign entered an agreement whereby Arrigoni agreed to transport the Yacht to Miami for the price of $11,500. Pl. 56(a)(1) Statement ¶ 13. On December 7, 2007, Arrigoni issued an invoice for the transport to Cigarette, and Cigarette sent him a down payment of

5

$4,000.  *Id.* ¶ 19.  The balance was to be paid upon Arrigoni's successful delivery of the Yacht to Florida.  *Id.* ¶ 19.

Arrigoni requested that Ensign move the Yacht to New Jersey for pick-up so that he would not have to obtain oversize permits for the State of Connecticut and could avoid transporting the Yacht through the New York metropolitan area.  *Id.* ¶ 15.  Pursuant to Arrigoni's request, Ross and Robert Gardella navigated the Yacht, by water, to Liberty Landing Marina in Jersey City, New Jersey.  *Id.* ¶ 16.  On December 12, 2007, Arrigoni accepted the Yacht at Liberty Landing Marina in good order and condition and loaded it onto his trailer for transport.  *Id.* ¶¶ 17-18.  The original plan was to deliver the Yacht to Coconut Grove Marina in Miami.   Arrigoni Depo. [Doc. #253-4] at 53.  However, while in transit Arrigoni learned that he would be unable to deliver the Yacht to Coconut Grove Marina because of its height, weight, and width.  *Id.*  Therefore, he arranged an alternate delivery point at Bill Fish Marina in Fort Lauderdale, Florida.  *Id.*

On December 14, 2007, the Yacht was damaged during transport by Arrigoni when it became partially dislodged from his trailer and came into contact with the road surface.  Arrigoni Depo. [Doc. #235] at 165-66.  Ensign claims that Arrigoni thereafter called and advised that he had delivered the Yacht to Bill Fish Marina rather than the agreed upon location of Coconut Grove Marina, and that Arrigoni asked if he could go to the Cigarette facility in Miami to obtain the outstanding balance due to him for the transport before he left Florida.  Pl. 56(a)(1) Statement ¶ 21.  According to Ensign, it learned for the first time that the Yacht had been

damaged when it was contacted by Bill Fish Marina. *Id.* ¶ 22. Arrigoni testified, however, that he notified a Cigarette representative with whom he was dealing at the time that he would be unable to deliver the Yacht to Coconut Grove Marina and obtained his approval to deliver it to Bill Fish Marina instead. Arrigoni Depo. [Doc. #253-4] at 52-58. Arrigoni further testified that he informed his contact at Cigarette that the Yacht had sustained damaged to its propellor shaft on the date of delivery.

After the Yacht was damaged, Ensign contacted Lloyds, Arrigoni's cargo insurer, in an attempt to obtain the proceeds necessary to repair the Yacht. Pl. 56(a)(1) Statement ¶ 28. Lloyds assigned a surveyor who surveyed the Yacht in Florida in its damaged condition. *Id.* ¶ 30. A lengthy claims process ensued, during which Ensign dealt directly with The Penobscot Group, Inc., the local affiliate of Lloyds. Lloyds ultimately denied coverage in July 2008.

Ensign claims that, in order to avoid losing its sale of the Yacht to Masterski, immediately after learning of the damage it contacted Norseman Shipbuilding Corporation ("Norseman") to perform the necessary repairs. *Id.* ¶ 32. According to Ensign, Masterski nevertheless cancelled its contract to purchase the Yacht when Ensign could not provide an estimated date of delivery. *Id.* ¶ 34. As discussed previously, Lloyds and Arrigoni dispute that Ensign ever had a contract to sell the Yacht to Masterski, and claim that the purchase agreement produced by Ensign in this litigation is a forgery.

Norseman completed its initial repairs on March 3, 2008 and billed Ensign for its services. *Id.* ¶ 35. Ensign did not have the funds to pay Norseman,

however, and Norseman commenced an admiralty action in the United States District Court for the Southern District of Florida in which it had the Yacht arrested to secure its maritime lien that arose as a result of its repairs. *Id.* ¶ 36. Finally, in the summer of 2008, Ensign was able to find a private lender to loan it the funds to pay Norseman, and the Yacht was released from its arrest by the district court on August 8, 2008. *Id.* ¶¶ 38-39. Final repairs on the Yacht were then completed, and Ensign placed the Yacht on the market for sale. *Id.* ¶ 44.

On October 14, 2008, Ensign entered into a contract with Enpro International, Inc., through broker Monaco Bay, Inc., to sell the Yacht for the sum of $750,000. *Id.* ¶ 42. The closing took place on December 2, 2008.

Ensign calculates its damages under the Carmack Amendment using two different measures. First, under its "diminution in value" measure, Ensign calculates damages based upon the fair market value of the Yacht had Arrigoni delivered it undamaged and the value of the Yacht upon delivery in its damaged condition. *See* Damages Analysis [Doc. #232]. Ensign claims that fair market value of the Yacht in its original condition was $1.25 million, and that its damaged/salved value was $450,000, resulting in total damages of $800,000, plus interest. *Id.* Ensign's sole support for the market value and salved value figures is the affidavit of Ross.[2] Ross Affidavit [Doc. #59] ¶¶ 51, 55. Ross does not explain

---

[2] Ensign also submitted the affidavit of Ronald A. Bethel ("Bethel") in support of its diminution in market value measure of damages. [Doc. #233]. However, on June 25, 2011, the Court ordered Bethel's affidavit stricken from the record because it had been submitted in violation of a previous order prohibiting Ensign from substituting a new expert witness for Ross. [Doc. #308]. Therefore,

8

in his affidavit what factors he used to arrive at his assessment of the fair market value of the Yacht. Arrigoni contests Ross's valuation of the Yacht. Arrigoni contends that the Yacht was the first of its kind and the only one ever built. Arrigoni's Local Rule 56(a)(3) Statement [Doc. #253] ¶ 14. Arrigoni further contends that the Yacht was extensively marketed for many months yet not a single purchase offer for the Yacht was ever received. *Id.* Therefore, according to Arrigoni, Ross has no basis for his assertion that the market value of the Yacht was $1.25 million.

Second, under its "loss of sale/lost profits" measure, Ensign calculates damages based upon the purported lost sale to Masterski along with the cost of repairs, storage, surveying, detailing, obtaining a public adjuster, borrowing money to recover the Yacht from arrest, and related expenses. *See* Damages Analysis [Doc. #232]. Based upon this measure, Ensign claims damages in the total amount of $659,063.71, plus interest. *Id.* Arrigoni disputes the largest element of Ensign's damages calculation under this theory, *i.e.*, loss of sale damages in the amount of $450,000. As noted above, Arrigoni contends that Ensign never had a contract to sell the Yacht to Masterski, and claims that the purchase agreement produced by Ensign in this litigation in support of its loss of sale damages is a forgery.

## II. RELEVANT PROCEDURAL BACKGROUND

Ensign initiated suit against Arrigoni, Lloyds, and the Saperstein Agency,

---

the Court will not consider Bethel's affidavit in deciding this motion.

Inc. ("Saperstein")[3] on February 4, 2009.  On March 16, 2009, Ensign filed an amended complaint as a matter of course.  [Doc. #11].  In the amended complaint, Ensign asserted causes of action against Arrigoni for breach of contract, violation of the Carmack Amendment, breach of implied contract, negligence, breach of the covenant of good faith and fair dealing, loss of sale, and violation of the Connecticut Unfair Trade Practices Act ("CUTPA"), and against Lloyds for breach of contract, bad faith, breach of the covenant of good faith and fair dealing, fraud, and breach of the Connecticut Unfair Insurance Practices Act ("CUIPA") and CUTPA (a so-called "CUIPA through CUTPA" claim).  *Id.*  On March 11, 2010, the Court dismissed all claims against Arrigoni other than the Carmack Amendment claim on the basis of Carmack preemption.  [Doc. #110].  The Court also dismissed the fraud and loss of sale claims against Lloyds.  *Id.*

On June 18, 2010, Lloyds filed its answer to Ensign's amended complaint, along with a counterclaim against Ensign for fraud.  [Doc. #146].  Lloyds's basis for asserting the fraud claim was that the purported contract for sale of the Yacht between Ensign and Masterski that Ensign relies upon to support a portion of its damages is fraudulent.  *Id.*  On July 7, 2010, Lloyds filed a third party complaint asserting a fraud claim against Ross based upon the same allegedly fraudulent contract.  [Doc. #158].  On July 9, 2010, Arrigoni filed his answer to Ensign's amended complaint, along with counterclaims against Ensign sounding in fraud

---

[3] **All claims against Saperstein were dismissed with prejudice pursuant to stipulation of the parties on July 2, 2010.  [Doc. #156].**

10

as well as breach of contract and tortious interference. [Doc. #159]. On August 11, 2010, Arrigoni also filed a cross-claim for fraud against Ross. [Doc. #178].

Ensign filed the present motion for summary judgment on its Carmack Amendment claim against Arrigoni on November 10, 2010. [Doc. #224]. On the same day, Ensign and Ross filed their motion for summary judgment with respect to the fraud claims asserted by Arrigoni and Lloyds. [Doc. #228]. Lloyds also filed a motion for summary judgment as to all remaining claims asserted against it by Ensign. [Doc. #210]. On July 15, 2011, the Court granted Lloyds's motion and thereby dismissed all of Ensign's remaining claims against Lloyds. [Doc. #319]. Accordingly, Lloyds remains in this case only as a counter claimant against Ensign and a third party plaintiff against Ross.

### III. STANDARD OF REVIEW

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court "construe[s] the evidence in the light most favorable to the non-moving party and . . . draw[s] all reasonable inferences in its favor." *Huminski v. Corsones*, 396 F.3d 53, 69-70 (2d Cir. 2004). "[I]f there is any evidence in the record that could reasonably support a jury's verdict for the non-moving party, summary judgment must be denied." *Am. Home Assurance Co. v. Hapag Lloyd Container Linie, GmbH*, 446 F.3d 313, 315 (2d Cir. 2006) (internal quotation marks omitted). "The moving party bears the burden of showing that he or she is entitled to summary judgment." *Huminski*, 396 F.3d at

69. "[T]he burden on the moving party may be discharged by 'showing'—that is pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 105 (2d Cir. 2002). "If the party moving for summary judgment demonstrates the absence of any genuine issue as to all material facts, the nonmoving party must, to defeat summary judgment, come forward with evidence that would be sufficient to support a jury verdict in its favor." *Burt Rigid Box, Inc. v. Travelers Prop. Cas. Corp.*, 302 F.3d 83, 91 (2d Cir. 2002).

## IV. DISCUSSION

### A. Arrigoni and Lloyds' fraud claims

Arrigoni and Lloyds assert fraud claims against Ensign and Ross based upon the purchase agreement between Ensign and Masterski which Ensign produced during the course of this litigation in support of its claim for lost sale damages. Ensign and Ross move for summary judgment with respect to the fraud claims, arguing that there is insufficient evidence in the record to prove that they committed fraud.

A party asserting a claim for fraud must prove the following four elements: "(1) a false representation was made as a statement of fact; (2) the statement was untrue and known to be so by its maker; (3) the statement was made with the intent of inducing reliance thereon; and (4) the party relied on the statement to his detriment." *Muller v. Muller*, 43 Conn. App. 327, 337-38 (1996).

There are clearly genuine issues of material fact that preclude summary

12

judgment on Arrigoni and Lloyds' fraud claims. The parties present conflicting evidence regarding the existence of a contract between Ensign and Masterski for sale of the Yacht. According to Ensign's version of the events, Fontanez discovered Masterski as a potential buyer for the Yacht and, following correspondence between the parties, Masterski agreed to purchase the Yacht for the sum of $1.2 million on December 12, 2007. Ensign claims that Ross then sent a copy of the purchase agreement which he had previously drafted to Masterski for execution. Having not received an executed copy back as expected, on December 15, 2007, he transmitted another copy to Fontanez so that he could arrange for its execution by Masterski. Fontanez testified that he sent the purchase agreement to Masterski and received an executed copy bearing Brun's signature back within one week, which he in turn transmitted to Ross.

Lloyds and Arrigoni present countervailing evidence that Masterski never actually agreed to purchase the Yacht. Brun testified that he never signed, received, or even saw a contract to purchase the Yacht from Ensign, and that he never told either Ross or Fontanez that he was going to purchase the Yacht. Brun explained that he needed to obtain a Certificate of European Compliance verifying that the Yacht could be registered in the French West Indies before commencing negotiations with Ensign to purchase the Yacht. Based upon the conflicting testimony of Ross and Fontanez on the one hand, and Brun on the other, there is a genuine dispute regarding the authenticity of the purchase agreement submitted by Ensign. If the trier of fact were to credit Lloyds and Arrigoni's version of the

13

events and find the purchase agreement to be a forgery, this would certainly qualify as a false representation.

In support of its claim that it had a valid contract with Masterski, Ensign also points to the December 12, 2007 email from Brun to Fontanez, originally written in French, in which Brun purportedly stated that Masterski and its investors were "in agreement" to purchase the Yacht. However, Lloyds and Arrigoni have called the validity of Ensign's uncertified translation of this email into doubt. According to certified translations submitted by Lloyds and Arrigoni, the email in question actually says that Brun and his investors were "eager to buy" or "hot to buy" the Yacht, not that they were "in agreement" to do so. Thus, the true import of Brun's words is in question.

Ensign argues, however, that even if the purchase agreement was forged, Lloyds and Arrigoni cannot sustain their fraud claims because there is insufficient evidence that Ensign and Ross had anything to do with the forgery. The Court disagrees. There is sufficient evidence from which a trier of fact could find that Ensign and Ross were responsible for creating the allegedly fraudulent purchase agreement, and that they did so knowingly and with the intent to induce reliance by Lloyds and Arrigoni. Although Ross maintains that Masterski agreed to purchase the Yacht on December 12, 2007, Lloyds and Arrigoni have presented evidence that Brun emailed Ross on that same date and requested that he provide a Certificate of European Compliance. Brun also testified that he spoke directly to Ross the following day and explained that he needed proof that the Yacht

conformed to European safety and security requirements so that it could be registered in the French West Indies. Therefore, there is evidence that on both December 12 and 13, 2007, Brun communicated to Ross directly his inability to commit to purchase the Yacht until he obtained the necessary certificate.

In addition, documentary evidence in the record contradicts Ensign's versions of the relevant events. Ensign claims that Ross created the purchase agreement using his computer on December 7, and emailed it to Brun on December 12, 2007. However, the "computer log" submitted by Ensign which displays the dates that documents from Ross's computer were "created" and "last modified" clearly shows that Ross did not create the purchase agreement until December 15, 2007. Therefore, Ross could not have emailed the purchase agreement to Masterski on December 12, 2007, as he claims he did. Furthermore, in the December 12, 2007 email itself, Ross states that he is sending three attachments - a commercial invoice, specifications for the Yacht, and wire transfer information. There is no mention, however, of the purchase agreement. Finally, Ross himself testified during his deposition that he created the purchase agreement on December 15, 2007 and that prior to that date he had not sent an agreement for Masterski's execution. The discrepancies between Ross's current assertions and the documentary evidence contained in the record gives rise to an inference of fraudulent intent on the part of Ross himself that precludes the entry of summary judgment in his and Ensign's favor.

Finally, Ensign argues that Lloyds and Arrigoni did not rely upon the

15

purchase agreement in any manner. This is patently false. Lloyds and Arrigoni have relied upon the purchase agreement to their detriment by, among other things, expending the time and effort necessary to litigate this case. This includes the legal fees and costs incurred in securing Brun's deposition testimony and preparing for and attending Fontanez's deposition, the costs associated with defending against Ensign's claim for lost sale damages, and the continuing cost of pursuing their fraud claims against Ensign and Ross. Furthermore, the Court entered a prejudgment remedy against Arrigoni in the amount of $728,726.72 based upon the damages Ensign allegedly incurred due to his negligence, the most substantial component of which was lost profits based upon Masterski's purported cancellation of the purchase agreement. [Doc. #97].

### B. Ensign's Carmack Amendment claim

Ensign's sole remaining claim in this case is a Carmack Amendment claim against Arrigoni for damages to the Yacht sustained while in Arrigoni's custody during transport. Ensign moves for summary judgment with respect to its Carmack Amendment claim, arguing that it has established all of the elements of this claim as a matter of law.

"The Carmack Amendment governs the liability of common carriers on bills of lading. A bill of lading is a transportation contract between a shipper/consignor (i.e., a seller of goods) and a carrier. The person named in the bill of lading as the person 'to whom or to whose order the bill promises delivery' is the consignee." *Paper Magic Group, Inc. v. J.B. Hunt Transp., Inc.* 318 F.3d 458, 461 (3rd Cir. 2003)

16

(citations omitted). "To make a prima facie case under the Carmack Amendment, a plaintiff must show 1) delivery to the carrier in good condition; 2) arrival in damaged condition; and 3) the amount of damages caused by the loss." *Project Hope v. M/V IBN SINA*, 250 F.3d 67, 74 n.6 (2d Cir. 2001). "If the plaintiff establishes the prima facie case, the burden shifts to the defendant to show both that it was free from negligence and that the damage to the cargo was due to one of the excepted causes relieving the carrier of liability." *REI Transp., Inc. v. C.H. Robinson Worldwide, Inc.*, 519 F.3d 693, 699 (7th Cir. 2008). The "excepted causes" are "acts of God, the public enemy, the act of the shipper himself, public authority, or the inherent vice or nature of the goods." *Project Hope*, 250 F.3d at 74 n.6.

Arrigoni does not dispute that he received the Yacht in good condition or that it arrived at its destination in damaged condition. Therefore, the first two elements of the prima facie case are established. Arrigoni argues, however, that there are genuine issues of material fact regarding the third element, the amount of damages caused by the loss.[4] Liability having been conceded, the only issue remaining on the Carmack claim is damages.

---

[4] Arrigoni also asserts a Carmack affirmative defense, arguing that the damage was caused by the "inherent nature" of the Yacht. However, on June 27, 2011, the Court granted Ensign's motion to strike Arrigoni's inherent nature defense on the bases that Arrigoni waived the defense by failing to timely plead it in his answer, that the defense is inapplicable on the facts of this case, and that Arrigoni spoliated evidence relevant to the defense by discarding the wooden blocks and damaged cross-member used in transporting the Yacht. [Doc. #310]. Therefore, the inherent nature defense is no longer at issue in this case.

The Carmack Amendment imposes liability for "actual loss or injury to the property[.]" 49 U.S.C. § 14706. The ordinary measure of damages under the Carmack Amendment is the difference between the market value of goods at the time of delivery and their market value had they arrived in good order at the time they were meant to be delivered. *Jessica Howard Ltd. v. Norfolk Southern Railroad Co.*, 316 F.3d 165, 168-69 (2d Cir. 2003). However, "[t]he market discount theory is not the exclusive measure of damages" under Carmack. *Thyssen, Inc. v. S/S Euronity*, 21 F.3d 533, 540 (2d Cir. 1994). A different method may be applied "if circumstances suggest a more appropriate alternative." *Jessica Howard*, 316 F.3d at 171; *see also Great Atlantic & Pacific Tea Co. v. The Atchison*, 333 F.2d 705, 707-08 (1964) ("Since the market value rule is merely a method, it is not to be applied in cases where it is demonstrated that another rule will better compute actual damages."). For instance, the Second Circuit has approved the award of repair or replacement costs as an alternative measure of damages in the absence of an open market from which a fair market value could be set. *Project Hope*, 250 F.3d at 77. The Carmack Amendment also permits recovery of lost profits unless they are speculative. *Camar Corp. v. Preston Trucking Co., Inc.*, 221 F.3d 271, 277 (1st Cir. 2000).

Here, Ensign asserts that Arrigoni is liable under the Carmack Amendment for an amount of damages equal to either (1) a "diminution in market value method," which it describes as the difference between the fair market value of the Yacht, had it been delivered undamaged, and the Yacht's damaged/salved value, in

18

the amount of $800,000, plus interest; or (2) a "lost sale/profits method," which includes replacement/repair damages and loss of profit damages, in the sum of $659,063.71, plus interest.

The Court holds that there are questions of material fact under either of Ensign's damages theories. First, Ensign's diminution in market value measure relies solely upon the affidavit of Ross. In his affidavit, Ross summarily asserts that the fair market value of the Yacht was $1.25 million, and that its damaged/salved value was $450,000. However, Ross's affidavit contains no analysis whatsoever as to how he arrived at these valuation figures. In addition, Ross's valuation of the Yacht is contested by Arrigoni, who contends that Ross is unqualified to provide an assessment of the market value of a Yacht for which there was in fact no market. Arrigoni cites evidence that the Yacht was a one-of-a-kind luxury vessel which was extensively marketed for many months and on which not a single purchase offer was ever received. Furthermore, Ross's credibility has been called into question based upon evidence in the record that Ross may have intentionally misrepresented the existence of a purchase agreement between Ensign and Masterski. Accordingly, there is a genuine factual dispute for trial regarding the market value of the Yacht.

Second, Ensign's repair/replacement costs plus "lost sale/profits" method of calculating damages relies substantially on the contract that Ensign claims it had entered to sell the Yacht to Masterski. The lost profits resulting from the purported sale to Masterski accounts for $450,000 of the $659,063.71 in damages

19

claimed by Ensign under this method. However, as discussed above, there is evidence in the record that the purchase agreement submitted by Ensign in support of its lost sale damages is a forgery and that Ensign never in fact had a contract with Masterski for sale of the Yacht. *See supra* Section IV.A. Therefore, Ensign cannot establish its damages under the "lost sale/profits" method as a matter of law. Whether or not Ensign had a contract with Masterski is a genuine issue of material fact that must be determined at trial.

## *V. CONCLUSION*

Based on the above reasoning, Ensign and Ross' motion for summary judgment against Arrogoni and Lloyds with respect to their fraud claims [Doc. #224] is DENIED. Ensign's motion for summary judgment on its Carmack Amendment claim against Arrigoni [Doc. #228] is also DENIED. This case will proceed to trial on Ensign's Carmack Amendment claim against Arrigoni and Arrigoni and Lloyds' fraud claims in accordance with the Court's June 30, 2010 Scheduling Order [Doc. #153].

                                              IT IS SO ORDERED.

                                              /s/
                                        Vanessa L. Bryant
                                        United States District Judge

Dated at Hartford, Connecticut: August 3, 2011.